Official Form 425A

# Plan of Reorganization for Small Business Under Chapter 11  02/20

**Brachium, Inc.'s Plan of Reorganization, Dated April 26, 2021**

**Background for Cases Filed Under Subchapter V**

### A. Description and History of the Debtor's Business

Brachium, Inc. (the "Debtor", "Debtor in Possession", "Brachium", or "Company") is a Delaware corporation with its principal place of business in San Ramon, California. Since 2015, the Debtor, as a startup technology company, has been in the early stages of pre-revenue dental and medical device business. The Debtor has developed the world's first patented dental autonomous robotic platform, capable of conducting dental and medical primary care without human intervention and with the goal of expanding usage to the medical field. Brachium's founders are Drs. Yaz Shehab ("Shehab"), George Wong ("Wong"), and Hadi Akeel ("Akeel").

The Company's 2018 commercial plan called for deploying its systems in a $93B annual dental services market in the United States to serve orthodontists, clear-aligner companies and healthcare retailers, such as Walgreens. Subsequently envisioned medical applications included primary care diagnostics and treatments, such as eye and hearing exams, and, more recently, COVID-19 testing. By 2018, the Company of approximately 15 individuals had secured $3M in Convertible Note financing, secured seminal Intellectual Property ("IP"), successfully conducted a 50-patient clinical trial, obtained customer letters of intent, and filed its FDA clearance pre-submission. At that time, the Company's pre-money valuation ranged from $10M to $33M, with no debt, as all its convertible notes would have converted into equity upon financing.

In 2018, while pursuing its Series-A financing, the Debtor came under an apparently hostile takeover bid by one of its three co-founders, George Wong, in collusion with his family members and others presented as an investor group from China, Tronvest Capital, SPC ("Tronvest"). In January 2019, while raising its Series-A funding, the Debtor alleges Tronvest's scheme was to bait Brachium into accepting hostile investment terms by blocking other investors, then delay the deal's closing date to drain its cash reserves, and ultimately force the Debtor into insolvency proceedings if it did not accept their terms. Initially, Tronvest offered Brachium an investment term sheet valuing the Company at $40M. Once Brachium was in the lockout period, Tronvest drained the Company's reserves by repeatedly failing to close its own term sheet for over four months; instead, negotiating it down to $33M and adding more unfavorable terms. After Brachium rejected Tronvest's investment offers three times, Tronvest deposited a $300,000 Convertible note as a show of good faith as a down payment on the Series-A closing; the same $300,000 contested by Tronvest. Still, after the Debtor's Board approved and signed the final purchase agreement, Tronvest failed to countersign the purchase agreement, failed to wire transfer the initial $1.2M tranche, and failed to show proof it possessed the investment funds. Instead, Tronvest introduced and insisted upon new non-conventional deal terms that would effectuate its takeover of Brachium. In January 2019 once Brachium finally withdrew from the deal, Tronvest continued its hostile actions to take over the Company via tortious interference in the Company's business.

Tronvest disputes Brachium's allegations regarding its conduct. The impact of this takeover attempt and subsequent litigation has severely reduced the Company's valuation, prevented investment, and halted its earning potential. The Company's 2018 financials projected aggregate revenues of $10M by the end of 2021, on the way to capturing projected aggregate revenues of $235M by the end of 2025.

Fundraising, product development and litigation management are currently Brachium's primary business activities as

it seeks to reorganize and progressively reinstate activities that have been temporarily placed on hold. The following are the pending litigation (collectively the "Pending Litigation") matters (please note all civil litigation matters have been consolidated):

a. *Brachium, Inc. v. George F. Wong, Christopher Niro.* is pending in the Contra Costa County Superior Court Case No. MSC19-00880 and is stayed by this bankruptcy case. Debtor is suing, among others, Wong, a shareholder and former board member, Christopher Niro ("Niro"), Brachium's former acting in-house counsel, for breach of fiduciary and related claims relating to interference with debtor's rights in IP; Wong and Niro cross-complained, alleging claims similar to and related to Tronvest, as well as derivative claims on behalf of shareholders for breach of fiduciary duty. The Company is pursuing damages upwards of $5M from Niro for his self-dealing with Tronvest and Wong; and upwards of $50M from all defendants.

b. *Tronvest v. Brachium., et al*. pending in the Contra Costa County Superior Court Case No. MSC19-01587, which has been consolidated with Lead Case No. MSC19-00880 and is stayed by this bankruptcy case. Tronvest sues to recover face amount of $300,000 note plus alleged fraudulent transfers by Debtor of its IP; debtor asserts substantial counterclaims. Tronvest has attachment order and injunction that impedes debtor's use of IP.

c. *Brachium v. Jonathan Wu* is pending in JAMS Arbitration under Reference Number 1120014827 where the Debtor sues to enjoin interference with trade secrets and IP. The Company alleges that Jonathan Wu, an ex-engineering employee, prior to his resignation stole trade secrets, and confidential source code and proprietary files. The Company is pursuing unspecified damages according to proof.

d. *Brachium v. Jonathan Wu* is pending in the Contra Costa County Superior Court Case No. MSC19-02055 where Debtor sues to enjoin interference with trade secrets and IP.

Fundraising during the past two years has been difficult because, upon learning about the litigation, and other potential litigation threats from Wong and Tronvest, investors' interest has been expressed to Brachium as being deferred until the litigation can be resolved. To make matters worse, the COVID-19 court delays have severely delayed the litigation process, thus delaying the Company's ability to fundraise post-litigation. In the course of the litigation, Wong and Tronvest obtained a preliminary injunction restraining Brachium's use of the IP, limiting its fundraising ability, subsequent commercialization and IP marketing based upon allegations that the Debtor was improperly transferring its IP to its long-time strategic product development partner Triple Ring Technologies, Inc ("TRT").

Brachium asserts that the preliminary injunction was improvidently granted and subject to reconsideration as it has had numerous agreements in place since 2016 that establishes TRT as a strategic product development partner with safeguards to protect its IP. A professional services agreement has existed between TRT and Brachium since May 24, 2016 that established any inventions, discoveries, developments, and innovations (collectively, "Inventions") conceived by employees and consultants of TRT during the time billed to Brachium pursuant to the agreement would be the exclusive property of Brachium. Further, TRT and Brachium entered into a non-disclosure agreement ("NDA") dated as of September 1, 2015 which included requirements for the parties to keep information confidential for a period of three years after termination, and a subsequent NDA dated July 15, 2019.

Tronvest and Wong's main evidence in support of their application for preliminary injunction was a declaration from a former Brachium engineer, Jonathan Wu, who the Company alleges stole thousands of confidential files and trade secrets prior to his resignation. However, during his deposition on July 15, 2020 and July 16, 2020, Wu admitted that he has no basis to support his declaration. The Company alleges the improperly obtained IP injunction is part of the creditors/defendants' conspiracy to take over the Company. Essentially, a few of the Company's own creditors have tortiously interfered in the Company's business to hamper its ability to recover and pay back its debts to the majority of its creditors.

Prior to this chapter 11 filing, Drs. Shehab and Akeel, two of the three founders of the Debtor, holding a two-thirds ownership interest, lent significant funds to the Debtor to fund its litigation and continue its operations with the focus on restoring full business operations. On the eve of bankruptcy, Brachium granted a lien to Shehab and Akeel to secure the return of their advances. Debtor believes the lien is supported by little value and offers Shehab and Akeel the right to treat their loans as capital contributions.

The Debtor is in good corporate and taxation standing. The majority of the Debtor's creditors are supportive convertible

note holder investors and service providers. The minority the Debtor's creditors are either the aforesaid defendants or hostile investor/creditors who are self- interested.

Brachium commenced this chapter 11 case to accomplish the following:

a. Reorganize the Debtor by way of this plan, which extends the term of the convertible notes; values the collateral subject to disputed liens at nothing; avoids those liens; obtain super-priority financing of the chapter 11 case; and ultimately discharge all claims by payment of modest amounts.

b. Market the IP with appropriate oversight, by the Case Trustee, of appropriate disclosure of the IP to potential investors

c. Contemporaneously, seek, if necessary, the dissolution of the injunction.

d. Evaluate and pursue, if necessary, derivative claims for the benefit of all creditors. (The derivative claims are property of the estate and subject to administration by Brachium as debtor in possession). The Subchapter V Trustee will be instrumental in determining the appropriate means to enforce the derivative claims.

e. Obtain an order valuing the secured claims of Tronvest (pursuant to its attachment and preliminary injunction) and George Wong, (pursuant to its preliminary injunction), and allowing use, sale, or lease of the IP with those creditors liens and interests transferred to the proceeds thereof.

f. Explore settlement of disputed claims by, among other things, license of IP for use in the dental field in satisfaction of creditor claims, which would allow Brachium to proceed with developing its IP for applications in the medical field.

g. Continue its pandemic-delayed litigation, where the Company is seeking substantial damages in the tens of millions for the benefit of its creditors.

**B. Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis demonstrating that such is the case is attached to the Plan as **Exhibit A.**

**C. Ability to make future plan payments and operate without further reorganization**

The Debtor will have enough cash over the life of the Plan to make the required Plan payments and operate its business.

Once the IP injunction is resolved the Plan Proponent will raise funds through the global licensing and sale of its intellectual property ("IP") for dental robotics while retaining rights to develop the IP for medical robotics. After licensing is completed, the Debtor will seek a further round of seed funding for the development of the IP for robotics use in the medical field. Additionally, there may be funding from litigation damages and additional loans from founders, other investors and litigation finance companies.

The Plan Proponent has provided projected financial information as **Exhibit B**.

The Plan Proponent's financial projections show that the Debtor will have projected disposable income (as defined by § 1191(d) of the Bankruptcy Code) for the period described in § 1191(c)(2) in a modest amount.

The final Plan payment is expected to be paid no later than five years from the effective date of the Plan.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

**Article 1: Summary**

This Plan of Reorganization (the *Plan*) under chapter 11 of the Bankruptcy Code (the *Code*) proposes to pay creditors of Brachium, Inc. (the *Debtor*) from revenue to be received from the exclusive global licensing and/or sale of its intellectual property for dental use, and recovery from ongoing litigation.

This Plan provides for:      <u>1</u> class of priority claims;
<u>3</u> classes of secured claims;
<u>2</u> classes of non-priority unsecured claim; and
<u>1</u> classes of equity security holders.

Non-priority unsecured creditors holding allowed claims will receive distributions, which the proponent of this Plan has valued at approximately <u>0.05</u> cents on the dollar. Holders of convertible notes may elect to convert to equity in the Debtor at the discretion of the Company.

The Plan provides for the payment of administrative and priority claims in the manner and for the period required by law.

All creditors and equity security holders should refer to Articles 3 through 6 of this Plan for information regarding the precise treatment of their claim. Unless the Bankruptcy Court orders otherwise, a disclosure statement that provides more detailed information regarding this Plan and the rights of creditors and equity security holders will not be circulated with this Plan.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

### Article 2: Classification of Claims and Interests

| | | |
|---|---|---|
| 2.01 | **Class 1** | *All allowed claims entitled to priority* under § 507(a) of the Code (except administrative expense claims under § 507(a)(2), and priority tax claims under § 507(a)(8)). |
| 2.02 | **Class 2(a)** | *The claims of <u>Yaz Shehab, and Hadi Akeel</u>*, to the extent allowed as secured claims under § 506 of the Code.<br><br>Claims of Class 2(a) creditors are scheduled by the Debtor in the amount of $738,543. Claim amounts may be subject to offset, counterclaims and objections. |
| 2.02 | **Class 2(b)** | *Secured claim of Tronvest Capital SPC*. Tronvest holds a claim which may be secured by certain property of the estate pursuant to a writ of attachment issued in Contra Costa County Superior Court Action No. MSC19-00800 (consolidated with MSC19-01587) on December 11, 2019, as well as a preliminary injunction issued in the same action on December 2, 2019, both of which restrain or impede the use, sale of lease of the subject property by the debtor. Debtor believes that the value of the property of the estate securing the claim is modest and will commence an Adversary Proceeding in this court to determine the nature, extent and validity of the Tronvest lien, as well as for other relief.<br><br>Additionally, debtor has asserted counterclaims against Tronvest in the aforesaid Superior Court Action.<br><br>The amount of Tronvest's claim that is deemed unsecured will be treated as Class 3(b). This claim was scheduled in the amount of $329,000. Claim amount may be subject to offset, counterclaims and objections. |
| 2.02 | **Class 2(c)** | *Secured claim of George Wong*. George Wong holds a claim which may be secured by certain property of the estate pursuant to a writ of attachment issued in Contra Costa Contra Costa County Superior Court Action No. MSC19-00800 (consolidated with MSC19-01587) on December 11, 2019, as well as a preliminary injunction issued in the same action on December 2, 2019, both of which restrain or impede the use, |

sale of lease of the subject property by the debtor. Debtor believes that the value of the property of the estate securing the claim is modest. Debtor will commence an Adversary Proceeding in this court to determine the nature, extent and validity of the Wong lien, as well as for other relief.

Additionally, debtor has asserted counterclaims against George Wong in the aforesaid Superior Court Action.

Amounts of George Wong's claim that are deemed unsecured will be treated as Class 3(b). Claim amount for Class 2(c) is scheduled as unliquidated.

| | | |
|---|---|---|
| 2.03 | **Class 3(a)** | All non-priority unsecured claims held by creditors in the form of convertible note agreements issued as part of the initial investment round started in 2016 (the "Initial Investment Round"). |
| | | Claims for Class 3(a) creditors were scheduled in the amount of $3,668,352.39. Claim amounts may be subject to offset, counterclaims and objections |
| 2.03 | **Class 3(b)** | All general non-priority unsecured claims allowed under § 502 of the Code other than the foregoing classes of unsecured claims. |
| | | Claims for Class 3(b) creditors were scheduled in the amount of $420,529.06. Claim amounts may be subject to offset, counterclaims and objections. |
| 2.04 | **Class 4** | Equity interests of the Debtor. |

### Article 3: Treatment of Administrative Expense Claims, Priority Tax Claims, and Quarterly and Court Fees

| | | |
|---|---|---|
| 3.01 | **Unclassified claims** | Under section § 1123(a)(1), administrative expense claims, and priority tax claims are not in classes. |
| 3.02 | **Administrative expense claims** | Each holder of an administrative expense claim allowed under § 503 of the Code will be paid in equal payments over the term of the Plan until paid in full or upon such other terms as may be agreed upon by the holder of the claim and the Reorganized Debtor. Reorganized Debtor shall be allowed to prepay administrative expenses without charge or penalty and may make a lump sum payment at the end of the Plan to pay any remaining administrative expense balances, if any. Final payments on administrative expenses shall be made no later than the fifth anniversary of the effective date of the Plan except for attorney and trustee fees incurred contemporaneously or that have not yet been billed to the Reorganized Debtor. |
| 3.03 | **Priority tax claims** | Each holder of a priority tax claim will be paid in regular installment payments in cash equal to the total value, as of the effective date of the plan, equal to the allowed amount of such claim over a period ending no later than 5 years after the date of the order for relief. Debtor-in-Possession or Reorganized Debtor may elect to prepay priority tax claims in one lump sum without charge or penalty. |
| 3.04 | **Statutory fees** | All fees required to be paid under 28 U.S.C. § 1930 that are owed on or before the effective date of this Plan have been paid or will be paid on the Effective Date. |
| 3.05 | **Prospective quarterly fees** | All quarterly fees required to be paid under 28 U.S.C. § 1930(a)(6) or (a)(7) will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code. |



## Article 4: Treatment of Claims and Interests Under the Plan

4.01 **Claims and interests shall be treated as follows under this Plan:**

| Class | Impairment | Treatment |
| --- | --- | --- |
| Class 1 – **Priority claims** excluding those in Article 3 | [ ] Impaired<br>[X] Unimpaired | Class 1 is unimpaired by this Plan, and each holder of a Class 1 Priority Claim will be paid in full, in cash, upon the later of the effective date of this Plan, or the date on which such claim is allowed by a final non-appealable order. |
| Class 2(a) – **Secured Claims** of Yaz Shehab and Hadi Akeel | [X] Impaired<br>[ ] Unimpaired | Class 2 creditors will receive an option, to be exercised no later than sixty (60) days prior to the fifth anniversary of the Effective Date to either receive cash distributions after the payment in full of Unclassified Claims, Class 1, Class 2(b), Class 2(c), Class 3(a), and Class 3(b) claims, OR to convert their claim into shares in the Reorganized Debtor based upon a share for each dollar of the allowed claims. No fractional shares will be issued if holder elects to convert, and the claim amount will be rounded to the nearest full dollar. Class 2(a) creditors may elect to convert a portion or all of their claim but cannot revoke their election after conversion. Notice of exercise of the option shall be provided to the Reorganized Debtor and the Subchapter V Trustee. |
| Class 2(b) –**Secured Claim** Tronvest Capital, SPC. | [X] Impaired<br>[ ] Unimpaired | The secured claim shall be allowed in the amount of its value, as fixed by the court in an adversary proceeding, as reduced by the amount of any judgment obtained against Tronvest in the Superior Court litigation ("Final Allowance of Tronvest Secured Claim"). Debtor shall pay the value in five equal annual installments commencing upon the later of the Effective Date or the date of Final Allowance of the Tronvest Secured Claim. |
| Class 2(c) –**Secured Claim** George Wong | [X] Impaired<br>[ ] Unimpaired | The secured claim shall be allowed in the amount of its value, as fixed by the court in the adversary proceeding, as reduced by the amount of any judgment obtained against George Wong in the Superior Court litigation ("Final Allowance of George Wong Secured Claim"). Debtor shall pay the value in five equal annual installments commencing upon the later of the Effective Date or the date of Final Allowance of the George Wong Secured Claim. |
| Class 3(a) – **Non-priority unsecured creditors holding convertible notes from the Initial Investment Round** | [X] Impaired<br>[ ] Unimpaired | Class 3(a) creditors will have the maturity dates of their notes extended for a period ending five years from the Effective Date. Each creditor will be paid at least $0.05 on the dollar of their allowed claim from a plan fund (the "Plan Fund")(as defined in Section 7.04) no later than the fifth anniversary of the Effective Date.<br><br>Creditors will have their rights to conversion preserved, at the discretion of the Company, based upon a Qualified Financing pursuant to which the Reorganized debtor issues and sells shares of its Preferred Stock for aggregate gross proceed of at least $750,000 (excluding all proceeds from the incurrence of indebtedness that is converted into such Preferred Stock, or otherwise cancelled in consideration for the issuance of such Preferred Stock) with the principal purpose of raising capital. Amounts |

| | | | |
|---|---|---|---|
| | | | subject to conversion will be reduced by amounts received in pro rata distributions. Rights to pro rata distribution shall cease upon conversion. |
| | Class 3(b) – **Non-priority unsecured creditors outside of those holding convertible notes from the Initial Investment Round** | [X] Impaired<br>[ ] Unimpaired | Class 3(b) creditors will have their maturity dates extended five years from the Effective Date. Each holder will be paid at least $0.05 on the dollar of their allowed claims from the Plan Fund or as agreed no later than the fifth anniversary of the Effective Date. |
| | Class 4 – **Equity security holders of the Debtor** | [ ] Impaired<br>[X] Unimpaired | Class 4 Interests are unimpaired and each holder of a Class 4 Interest shall retain their interests. |

### Article 5: Allowance and Disallowance of Claims

**5.01 Disputed claim**

A *disputed claim* is a claim that has not been allowed or disallowed by a final non-appealable order, and as to which either:

(i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or

(ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

**5.02 Delay of distribution on a disputed claim**

No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order.

**5.03 Settlement of disputed claims**

The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

### Article 6: Provisions for Executory Contracts and Unexpired Leases

**6.01 Assumed executory contracts and unexpired leases**

(a) The Debtor assumes, and if applicable assigns, the following executory contracts and unexpired leases as of the effective date:

NONE

(b) Except for executory contracts and unexpired leases that have been assumed, and if applicable assigned, before the effective date or under section 6.01(a) of this Plan, or that are the subject of a pending motion to assume, and if applicable assign, the Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases as of the effective date.

A proof of claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than <u>30</u> days after the date of the order confirming this Plan.

### Article 7: Means for Implementation of the Plan

7.01    a. The Reorganized Debtor shall market its assets for licensing or sale for a period of three (3) years following the Effective Date (the "Marketing Period"), consulting and working closely with Christopher Hayes, the duly appointed Subchapter V Trustee in this case, regarding the marketing of the Debtor's intellectual property (the "IP") to potential investors, licensees, and purchasers.

   b. During the Marketing Period, the Reorganized Debtor shall ensure that the marketing process results in fair, arms'-length transaction, including preventing dissemination of the IP to third parties without proper compensation by requiring non-disclosure agreements from interested parties, seeking approval from the Subchapter V Trustee prior to any disclosure of the minimum necessary IP to interested parties, and by providing the Subchapter V Trustee full and unfettered access to the interested parties that the Reorganized Debtor is in negotiations with and all communications between the parties.

   c.  Creditors and parties in interests can request information from the Subchapter V Trustee in accordance with §§ 1183(b)(1) and 704(a)(7) of the Code unless the Court orders otherwise. At the request of the Debtor or the Reorganized Debtor, or on the Subchapter V Trustee's own accord, request for information may be subject to a non-disclosure agreement or other restrictions within the limits of §§ 1183(b)(1) and 704(a)(7) of the Code to the extent the Subchapter V Trustee believes is necessary to protect the estate.

   d. During the Marketing Period and for as long as the case is pending under chapter 11, the Reorganized Debtor will continue to operate the business to preserve and maximize the going concern value of the estate. IP does not need to be sold, licensed, or otherwise monetized as a whole and can be separated by region or field of use based upon the business judgment of the Reorganized Debtor.

   e. In the event that the Reorganized Debtor or Subchapter V Trustee determines that the estate's creditors or parties in interest are interfering with good faith efforts to market the IP, either party may seek relief from the Court, including seeking to limit the furnishing of information concerning the estate and the estate's administration to parties interfering with the marketing of the IP, and raise any concerns on 7 days' notice to the Reorganized Debtor, any DIP Lenders, and all parties on the Court's NEF service list, as well as the United States Trustee.

   f. The Reorganized Debtor shall complete the marketing of IP during Marketing Period and reach an agreement to license, sell or otherwise monetize the IP, which will be subject to approval of the Court. Any agreement shall close no later than eight months after the Marketing Period.

7.02    If any future investment transaction entered by the Reorganized Debtor includes terms for reduction or elimination of debt, unless otherwise limited in the investment agreement, funds specifically earmarked for debt reduction shall be treated as disposable income for purposes of funding the Plan Fund. Notwithstanding anything to the contrary, investment agreements entered into by the Reorganized Debtor do not need to contain debt reduction terms and investment funds are not to be treated as earned income for disposable income calculation unless specifically agreed to in an investment agreement.

7.03    In the event that the Reorganized Debtor or Subchapter V Trustee determines that the estate's creditors or parties in interest are interfering with good faith efforts to market the IP during the Marketing Period, either party may seek relief from the Court, including seeking to limit the furnishing of information concerning the estate and the estate's administration to parties interfering with the marketing of the IP, and raise any concerns on 7 days' notice to the Reorganized Debtor, any DIP Lenders, and all parties on the Court's NEF service list, as well as the United States Trustee.

7.04    The Plan Fund for Class 3(a) and 3(b) claims shall be funded by disposable income, any and recoveries from insiders, or funding from DIP lenders designated for repayment of unsecured claims received up until the fifth anniversary of the Effective Date. If the Debtor or Reorganized Debtor receives cumulative litigation damage awards from the Pending Litigation that exceeds amounts necessary to reimburse expenses prior to the fifth anniversary of the Effective Date, such amounts shall be used to pay in the priority required by the Code allowed unclassified claims, Class 1 Claims, Class 2(b) Claims, and Class 2(c) Claims. Any amounts remaining after payment of claims with priority over unsecured claims shall be used to fund the Plan Fund for distributions to Class 3(a) and 3(b) creditors.

7.06    Notwithstanding anything to the contrary, the Reorganized Debtor need not license its IP for use in the dental field if it can otherwise provide for the full satisfaction of all Claims prior to the second anniversary of the Effective Date. Upon timely satisfaction of such Claims, the Plan shall terminate.

7.07    Notwithstanding anything to the contrary, the Debtor in Possession may prepay all or any portion of any Claim at any time without charge or penalty.

7.08    Notwithstanding anything to the contrary, every claim which is not timely filed herein shall be discharged without payment on the Confirmation Date.

7.09    Entry of the Order of Confirmation will permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims modified pursuant to the Plan.

7.10    Any payment to be made under the Plan shall be deemed timely made if it is mailed to the recipient's last known address within 10 calendar days following the date described in this Plan.

7.11    The Reorganized Debtor shall have the right, post-confirmation, to pursue any and all Causes of Action that survive the revesting of assets contemplate by this Plan

7.12    From and after the Confirmation Date:

   a. Any amounts to be paid under this Plan shall be paid by the Reorganized Debtor or by shareholders by voluntary agreement and approval by the Reorganized Debtor's Board of Directors.

   b. All funds which are undisbursed or are returned, e.g., because the recipient of the funds could not be located or because the recipient refused to accept the funds and are not claimed within 90 days following initial disbursement, and any other excess and undistributable cash, including de minimis distributions, shall be retained by the Subchapter V Trustee.

7.13    From and after the Effective Date, the Reorganized Debtor may move the Court for such Orders as it deems advisable or beneficial to creditors or for the implementation of this plan.

7.14    From and after the Effective Date, only the Reorganized Debtor and Subchapter V Trustee may prosecute objections to claims.

7.15    Any payment to be made under the Plan shall be deemed timely made if it is mailed to the recipient's last known address within 10 calendar days following the date described in this Plan.

7.16    Notwithstanding anything to the contrary, the Subchapter V Trustee shall have a period of one year after the Effective Date to investigate claims against insiders and recommend to the Reorganized Debtor prosecution of any claims against insiders that so warrant. Reorganized Debtor does not need to await a recommendation from the Subchapter V Trustee to pursue claims in the best interest of the estate and creditors.

7.17    The Reorganized Debtor shall likewise have a period of one year after the Effective Date to file any claim to avoid or recover a preferential or fraudulent transfer of property of the estate.

### Article 8: General Provisions

| | | |
|---|---|---|
| 8.01 | **Definitions and rules of construction** | The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan, and they are supplemented by the following definitions:<br><br>**[N/A]** |
| 8.02 | **Effective date** | The Effective Date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated. |
| 8.03 | **Severability** | If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan. |
| 8.04 | **Binding effect** | The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity. |
| 8.05 | **Captions** | The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan. |

| 8.06 | **Controlling effect** | Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of California govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.] |
|---|---|---|
| 8.07 | **Corporate governance** | Upon confirmation of the Plan and the occurrence of the Effective Date, the Debtor's current management will continue in their day-to-day management of the Debtor and administer the Plan, including, but not limited to, the filing of any objections to proofs of claim filed and asserted against the Debtors. |

Following the Effective Date, the Reorganized Debtor shall amend its organizational documents, which shall amend or succeed the certificates or articles of incorporation, by-laws and other organization documents to satisfy the provisions of the Plan and the Code, and will (i) include, among other things, pursuant to § 1123(a)(6) of the Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by § 1123(a)(6) of the Code; and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein. After the Effective Date, the Reorganized Debtor may amend and restate their certificates or articles of incorporation and by-laws, and other applicable organizational documents, as permitted by applicable law.

Post-Confirmation, the Officers of the Debtor, and their compensation shall be as follows:

| **Name** | **Position** | **Compensation** |
|---|---|---|
| Yaz Shehab | Chief Executive Officer | $100,000 annually |
| Hadi Akeel | Chief Robotics Officer | $100,000 annually |
| Ashar Ahmed | Secretary | |

Officers have elected to take a reduced annual salary up until the fifth anniversary of the Effective Date, but pursuant to an incentive scheme will be provided the opportunity for restoration of pre-petition annual salary upon satisfaction of certain EBITDA milestones, or payment in full of all creditor claims.

| 8.08 | **Retention of Jurisdiction** | The Bankruptcy Court shall retain and have jurisdiction over the Reorganization Case for all purposes provided by the Code, including, without limitation, for the following purposes: |
|---|---|---|

a.  To determine any and all objections to the allowance of Claims and to allow, disallow, estimate, liquidate or determine any Claim;

b.  To grant full and complete relief upon the request of the Reorganized Debtor;

c.  To determine any and all motions for compensation and reimbursement of expenses and any other fees and expenses authorized to be paid or reimbursed under the Code or the Plan which accrued on or prior to the Confirmation Date;

d.  To determine any and all applications, adversary proceedings and contested or litigated matters that may be pending on the Effective Date, except as provided in the Confirmation Order, or which shall be commenced on or after the Effective Date and be properly before the Bankruptcy Court;

e.  To consider any modifications of the Plan, any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Order of Confirmation, to the extent authorized by the Code; and

f.  To implement the provisions of the Plan and to issue orders in aid of execution of the Plan to the extent authorized by §1142 of the Code.

Debtor Name: Brachium, Inc.　　　　　　　　　　　　　　　　　　　　　Case Number: 20-30047-HLB

## Article 9: Discharge

If the Debtor's Plan is confirmed under § 1191(a), on the effective date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt:
　　　　(i) imposed by this Plan; or
　　　　(ii) to the extent provided in § 1141(d)(6).

If the Debtor's Plan is confirmed under § 1191(b), confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the first 3 years of this Plan, or as otherwise provided in § 1192 of the Code. The Debtor will not be discharged from any debt:
　　　　(i)　on which the last payment is due after the first 3 years of the plan, or as otherwise provided in
　　　　　§ 1192; or
　　　　(ii) excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of the
　　　　　Federal Rules of Bankruptcy Procedure.

## Article 10: Other Provisions

**[N/A]**

Respectfully submitted,

/s/ Yaz Shehab
[Signature of the Plan Proponent]　　　　　　　　　　　　　　Yaz Shehab, Chief Executive Officer and Responsible Individual

/s/ Iain A. Macdonald
[Signature of the Attorney for the Plan Proponent]　　　　　　　Iain A. Macdonald

# EXHIBIT A

*Liquidation Analysis of Brachium, Inc.*

**Assets**

| | | | |
|---|---|---|---|
| | Cash on Hand | | $241.41 |
| | Accounts Receivable | | $0.00 |
| | Inventory | | $0.00 |
| | Office Furniture, Fixtures, and Equipment | | |
| | | Office Furniture & Equipment | $1,245.00 |
| | | Business Equipment | $2,590.00 |
| | Machinery, Equipment and Vehicles | | |
| | | Technical Equipment | $4,705.00 |
| | Real Property | | $0.00 |
| | Intangibles and Intellectual property | | |
| | | Patents, Copyright, Trademarks, and Trade Secrets (Est.) [1] | $50,000.00 |
| | All Other Assets | | |
| | | Brachium, Inc. V. George Wong, Christopher Niro | Unknown |
| | | Brachium, Inc. V. Tronvest | Unknown |
| | | Brachium, Inc. V. Jonathan Wu | Unknown |

**Total Assets** — $58,781.41

**Less**

| | |
|---|---|
| Secured Creditors | $1,067,543.00 |
| (Est.) Capital Gains | $0.00 |
| (Est.) Chapter 7 Trustee Fees and Expenses [2] | $38,335.40 |
| (Est.) Chapter 11 Administrative Expenses | $15,000.00 |
| Priority Claims | $0.00 |

**Total Secured, Administrative and Priority Claims** — $1,120,878.40

| | |
|---|---|
| Balance for General Unsecured Creditors | $0.00 |
| Total Dollar Amount of General Unsecured Claims | $4,088,881.45 |

**Percentage of Claim Which Unsecured Claim and Interest Holders Would Receive in a Hypothetical Chapter 7 Liquidation** — 0.00%

**Footnotes**

| | |
|---|---|
| 1 | This amount represents the estimated liquidation value of the intellectual property ("IP"). The IP is currently subject to a preliminary injunction and is not freely and openly marketable without further commitment of capital and other resources. Even absent the preliminary injunction, until the IP is commercialized, in part or as a whole, it has a relatively low value. Further, the value of the IP is driven down in liquidation as there is limited opportunity to facilitate knowledge transfers from Brachium employees and other transition assistance for a buyer. Brachium asserts that there is more value to extract from the IP for the benefit of the estate and creditors if it is allowed to continue development and marketing as an ongoing concern. |
| 2 | Assumes that a Chapter 7 Trustee would not abandon the assets and a cost of sale of 8%. |

# EXHIBIT B

**Exhibit B**

| Brachium Financial Projections | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| PHASE | | | SALE OF DENTAL ROBOTICS IP | | COMMERCIALIZATION OF MEDICAL ROBOTICS IP | | | | | |
| Milestones | | | Dental IP Sold | Litigation End | Funding Secured | | FDA Clear | | | |
| Outcomes | | | | 1st Revenues | Begin Medical IP Comercialization | | Generate Medical Robotics IP Revenues | | | |
| REVENUES | Assumption-1 | Assumption-2 | Yr-1 | Yr-2 | Yr-3 | Yr-4 | Yr-5 | Yr-6 | Yr-7 | Yr-8 |
| Dental IP Sale / Licensing | $750K Advance | $250K/yr royalty | | $ 750,000 | $ 250,000 | $ 250,000 | $ 250,000 | $ 250,000 | $ 250,000 | $ 250,000 |
| Medical IP Partial Licensing | $250K Advance | $100K/yr royalty | | | $ 250,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 |
| Likely Collected Litigation Damages | Niro Malpractice Ins. Policy | Low Est. of Total Damages | $ - | $ 5,000,000 | $ - | $ 50,000,000 | | | | |
| Medical Device Revenues | Trigger: Litigation complete | Funding Secured | $ - | $ - | $ - | $ - | $ 261,778 | $ 2,957,520 | $ 12,432,901 | $ 49,147,491 |
| TOTAL REVENUES | | | $ - | $ 5,750,000 | $ 500,000 | $ 50,350,000 | $ 611,778 | $ 3,307,520 | $ 12,782,901 | $ 49,497,491 |
| | | | | | | | | | | |
| COS / COGS | | | | | | | | | | |
| IP Marketing Costs | | | $ 50,000 | $ 50,000 | | | | | | |
| Device COGS | | | | | | | $ 302,475 | $ 2,591,158 | $ 8,644,496 | $ 32,713,534 |
| TOTAL COST OF SALES/GOODS | | | $ 50,000 | $ 50,000 | | | $ 302,475 | $ 2,591,158 | $ 8,644,496 | $ 32,713,534 |
| | | | | | | | | | | |
| GROSS PROFIT | | | $ (50,000) | $ 5,700,000 | $ 500,000 | $ 50,350,000 | $ 309,302 | $ 716,362 | $ 4,138,405 | $ 16,783,957 |
| | | | | | | | | | | |
| DIP FINANCING | | | $ 600,000 | $ 600,000 | | | | | | |
| | | | | | | | | | | |
| EXPENSES | | | | | | | | | | |
| Dental IP Licensing Phase | | | | | | | | | | |
| HR | Scaled down operations | | $ 230,000 | $ 230,000 | Factored in Medical IP Commercialization Phase below | | | | | |
| Ops, Accounting, Corporate | No facilities in Yr-1-2 | | $ 15,000 | $ 15,000 | Factored in Medical IP Commercialization Phase below | | | | | |
| Legal - Corporate | Licensing deal closing fees | | | $ 25,000 | Factored in Medical IP Commercialization Phase below | | | | | |
| Legal - IP | IP Portfolio Maintenance | | $ 25,000 | $ 25,000 | Factored in Medical IP Commercialization Phase below | | | | | |
| Legal - Litigation | 48 mo of litigation | | $ 120,000 | $ 120,000 | $ 120,000 | $ 120,000 | | | | |
| Legal - BK | BK Legal Fees | | $ 100,000 | $ 10,000 | $ 5,000 | $ 5,000 | $ 5,000 | | | |
| BK Court & Trustee Fees | | | $ 15,000 | $ 7,500 | $ 7,500 | $ 2,500 | $ 2,500 | | | |
| TOTAL Dental IP Licensing Phase Expenses | | | $ 505,000 | $ 432,500 | $ 132,500 | $ 127,500 | $ 7,500 | | | |
| | | | | | | | | | | |
| Medical IP Commercialization Phase | | | | | | | | | | |
| Engineering & Clin/Reg | Historical Data from 2018-2019 Brachium Financial Models | | | | $ 2,435,694 | $ 626,167 | $ 1,878,979 | $ 2,387,000 | $ 2,407,400 | $ 2,692,870 |
| Sales & Marketing | Historical Data from 2018-2019 Brachium Financial Models | | | | $ 216,667 | $ 283,333 | $ 2,112,384 | $ 2,740,803 | $ 4,187,631 | $ 8,903,192 |
| G&A | Historical Data from 2018-2019 Brachium Financial Models | | | | $ 701,250 | $ 720,000 | $ 1,360,002 | $ 1,546,076 | $ 1,867,287 | $ 2,715,605 |
| | | | | | $ - | | | | | |
| TOTAL Medical IP Commercialization Phase Expenses | | | | | $ 3,353,611 | $ 1,629,500 | $ 5,351,365 | $ 6,673,879 | $ 8,462,318 | $ 14,311,668 |
| | | | | | | | | | | |
| TOTAL EXPENSES | | | $ 505,000 | $ 432,500 | $ 3,486,111 | $ 1,757,000 | $ 5,358,865 | $ 6,673,879 | $ 8,462,318 | $ 14,311,668 |
| | | | | | | | | | | |
| EBITDA | | | $ 45,000 | $ 5,867,500 | $ (2,986,111) | $ 48,593,000 | $ (5,049,563) | $ (5,957,518) | $ (4,323,913) | $ 2,472,289 |
| | | | | | | | | | | |
| Ending/Cumulative Cash Burn | | | $ 45,000 | $ 5,912,500 | $ 2,926,389 | $ 51,519,389 | $ 46,469,826 | $ 40,512,308 | $ 36,188,395 | $ 38,660,685 |
| | | | | | | | | | | |
| Ending / Cumulative Cash - If No Litigation Recovery | | | $ 45,000 | $ 912,500 | $ (1,161,111) | $ (4,641,722) | $ (8,530,174) | $ (14,487,692) | $ (18,811,605) | $ (16,339,315) |
| | | | | | | | | | | |
| Anticipated Medical Device Commercialization Funding Amount | | | | | $ 4,641,722 | | $ 18,811,605 | | | |

**ASSUMPTIONS**

**Years 1-2: Sale of Dental IP Phase**
* Dental IP is sold or licensed, pending removal of IP injunction and Writ
* Litigation is complete, patrtial damages collected, more damages collected in Year 4
* Company's Medical Robotics IP commercialization funding concluded post-litigation.

**Years 3-5: Commercialization of the Medical Robotics IP Phase**
* Funding secured to commercialize the Medical Robotics IP post litigation termination
* More litigation damages collected.
* Medical Robotics revenues captured from partial licensing, and from post-FDA-cleared medical device.
* Projected values in this phase are from prior historical Brachium Series-A financial models